HEIDI J. McINTOSH (Colorado Bar No. 48230) (*Pro Hac Vice Pending*)
STUART C. GILLESPIE (Colorado Bar No. 42861) *(Pro Hac Vice Pending)*
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
T: 303-623-9466
F: 303-623-8083
hmcintosh@earthjustice.org
sgillespie@earthjustice.org

*Counsel for the Tohono O'odham Nation,*
*the Pascua Yaqui Tribe, and the Hopi Tribe*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
TUCSON DIVISION

| | |
|---|---|
| TOHONO O'ODHAM NATION, PASCUA YAQUI TRIBE, and HOPI TRIBE <br><br> Plaintiffs <br><br><br> vs. <br><br><br> UNITED STATES FOREST SERVICE, an agency in the U.S. Department of Agriculture; SONNY PERDUE, U.S. Secretary of Agriculture; VICKI CHRISTIANSEN, Interim Chief of the U.S. Forest Service; KERWIN S. DEWBERRY, Supervisor of the Coronado National Forest; <br><br> Defendants. | Case No. <br><br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

1

## INTRODUCTION

1.     Plaintiffs TOHONO O'ODHAM NATION, PASCUA YAQUI TRIBE, and HOPI TRIBE (collectively, "the Tribes" unless otherwise specified) challenge the Forest Service's June 6, 2017 Record of Decision ("ROD") and Final Environmental Impact Statement ("FEIS") approving Hudbay Minerals Inc.'s application to develop the Rosemont open-pit copper mine.  The mine and related developments would be situated on public lands with profound cultural and religious significance to the Tribes, whose ancestors have used the area over the course of approximately 10,000 years for ceremonial, religious and other purposes.  These lands, and the water, wildlife, native plants, ancient burial grounds, and other natural and cultural values found there, are central to the history, culture and religious life of the Tribes' members.

2.     Development of the Rosemont mine would irreparably sever the Tribes' connection to the Santa Rita Mountains and devastate a rich, continuous cultural and historical tradition dating to the Archaic period of 7500 – 2000 B.C.E.  The Pascua Yacqui and Hopi Tribes' ties to lands impacted by the mine are profound as well, with deep cultural and religious significance.  The mine would deprive members of the Tribes access to the places they and their ancestors have gone to pray, receive blessings, honor their ancestors and collect traditional medicines and basket weaving materials since time immemorial.  The mine would destroy a critical part of the Tribes' heritage and permanently hinder tribal members from engaging in important cultural practices and religious traditions.

2

3.      As approved by the Forest Service, much of the mine pit itself would be located on private lands that Hudbay's predecessor patented, i.e., acquired from the federal public domain, under the General Mining Law of 1872 (the Mining Law.)  The Mining law authorizes the transfer of public lands to private entities conditioned on the presence of valuable, economically recoverable subsurface minerals.  Additionally, the Forest Service approved industrial-scale mining activities on public lands, where Hudbay holds unpatented mining claims with no proven valuable minerals.  These activities include, among other things, portions of the open pit, waste rock and tailings piles containing over half a billion tons of material, industrial-scale ore processing plants, and massive amounts of groundwater pumping from a regional aquifer.  In all, the mine would transform 3,653 acres of publicly-owned National Forest land from its current natural state, with significant cultural sites, scenic rolling hills and wildlife like the endangered jaguar—a species with deep cultural and religious significance to the O'odham people—into an industrial mining zone.

4.      After the mine is exhausted, the Forest Service will allow Hudbay to leave a toxic pit lake that would remain in perpetuity, never to be reclaimed or remedied.  At that point, the pit will become a hydraulic sink, permanently reversing groundwater flows away from—and ultimately dewatering—seeps, springs, and riparian areas in the region.

5.      As the Forest Service admits, the damage to cultural resources would be "severe, irreversible, and irretrievable."

6.      Despite these severe impacts, the Forest Service never considered exercising its statutory and regulatory authority to deny Hudbay's request to use the

unpatented claims to dump its waste rock piles or construct the tailings facilities and processing facilities.  Instead, the agency erroneously concluded that Hudbay had a statutory right under the 1872 Mining Law to dump waste and permanently occupy the public lands covered by the unpatented claims.   This conclusion was contrary to the law, not based on a consideration of the relevant factors, unsupported by the record, and contrary to the evidence before the agency.

7.     This fundamental error prejudiced the entire decision-making process and led to the violations of federal law alleged herein.  First, the Forest Service violated the Organic Administration Act of 1897 ("Organic Act"), 16 U.S.C. §§ 478, 551, and its implementing regulations by failing to exercise its authority to protect the public lands from "destruction."  Second, the Forest Service violated the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), by failing to: 1) consider a reasonable range of alternatives; 2) determine whether each alternative, including the no-action alternative, would comply with applicable environmental laws, including the Organic Act and the agency's implementing regulations; 3) take a hard look at the cultural impacts of the proposed mine on the Tribes; and 4) analyze the cumulative impacts of the project on cultural and religious values of importance to the Tribes.  Third, the Forest Service's crabbed view of its authority to protect the public lands covered by the unpatented claims led, in turn, to a truncated and flawed consultation process in violation of the National Historic Preservation Act, 54 U.S.C. § 300101 *et seq.* (1966) ("NHPA").  By assuming Hudbay had the right to permanently occupy public lands on its unpatented claims, the agency erroneously circumscribed its "decision-making space" and unlawfully limited its

4

consultation with the Tribes, thereby undermining the purposes of the consultation—to, among other things, develop alternatives and measures to mitigate the impacts of the mine.

8.      These failures were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, violating the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA").

## JURISDICTION AND VENUE

9.      The Tribes bring this case pursuant to the laws of the United States; jurisdiction is therefore proper pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

10.      This court also has jurisdiction pursuant to 28 U.S.C. § 1362, which provides that "district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

11.      The Defendants' sovereign immunity is waived under the APA, 5 U.S.C. §§ 701-706.

12.      The Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 705-706 and Rule 65 of the Federal Rules of Civil Procedure.  The Court also has inherent authority to award injunctive relief.

13.      The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

14.     Venue is proper pursuant to 28 U.S.C. § 1391 because the Tohono O'odham

Nation and Pascua Yaqui Tribe reside in the Tucson Division of the District of Arizona;

the decision was made in the Tucson Division; the lands at issue in this suit are located

approximately 30 miles south of Tucson in Pima County, Arizona; and a substantial part

of the events giving rise to the Tribes' legal claims occurred in the Tucson Division.

Additionally, Defendant Forest Supervisor Kerwin Dewberry's office is in Tucson,

Arizona.

## PLAINTIFFS

15.     The TOHONO O'ODHAM NATION, headquartered in Sells, Arizona, is a

federally-recognized sovereign tribe with approximately 33,000 enrolled members.  For

thousands of years, members of the Nation and their ancestors occupied much of Sonora,

Mexico and southern Arizona from the San Pedro River in the east to the Colorado River

in the west, an aboriginal homeland that includes the Santa Rita Mountains.  The Nation

now holds a combined area of 2.8 million acres of reservation land located west of the

Santa Rita Mountains.

16.     The Nation's Constitution prioritizes the protection of the environment.

The Nation's stated policy, reflected in its Constitution, is to:

> encourage productive and enjoyable harmony between members of the nation and
> their environment; to promote efforts which will preserve and protect the natural
> and cultural environment of the Tohono O'odham Nation, including its lands, air,
> water, flora and fauna, its ecological systems, and natural resources, and its
> historic and cultural artifacts and archeological sites; and to create and maintain
> conditions under which members of the nation and nature can exist in productive
> harmony and fulfill the social, economic, and other requirements of present and
> future generations of members of the Tohono O'odham Nation.

Tohono O'odham Constitution, Art. XVIII, Sec. 1.

17.    Before their reservation was created by executive orders in the late 1800s, members of the Nation and their ancestors, the Hohokam people, lived in the Santa Rita Mountains for approximately 10,000 years.  Today, many members of the Nation visit the Santa Rita Mountains, including the proposed Rosemont mine site, to observe religious rituals, honor the ancestors who lived and were buried there, visit sacred seeps and springs, and gather the bear grass, yucca, and Devil's Claw they use to craft their renowned woven baskets, the sales of which provide important income for members of the Nation.  The Nation's ancestral lands would be severely and irreversibly damaged by the mine, and their cultural and religious ties to the land would be irreparably severed.

18.    The Tribes have a right to any culturally affiliated Native American cultural items and ancestral remains that are excavated or discovered on federal lands within the project area.  The Tribes can, upon notice, state a claim for such remains or objects.  *See* 25 U.S.C. § 3002(a); 43 C.F.R. § 10.6.

19.    In an effort to protect this sacred place, the Nation has consistently opposed the Rosemont mine proposal in numerous meetings and in written correspondence with Forest Service representatives, as well as in public hearings and meetings.  The Nation's Legislative Council passed Resolution 09-569 opposing the mine on October 22, 2009.  It has produced and publicly distributed a video documenting its opposition to the mine and

the impacts of the mine.[1]  It submitted formal comments and objections to the Forest Service during the NEPA process for the mine, and has, therefore, exhausted its administrative remedies.

20.     Members of the Nation intend to visit the Santa Rita Mountains in the near future, including the proposed mine site, to engage in the same activities the O'odham people have engaged in for hundreds of generations:  to honor the ancestors who are buried there, enjoy the natural environment, collect medicines and basket making materials, and to pray and ask for blessings at the seeps and springs that would be affected by the mine.

21.     THE PASCUA YAQUI TRIBE is a federally recognized Indian tribe with approximately 8,000 members in Southern Arizona.  The Yaqui have lived, travelled, and hunted throughout the Gila and Santa Cruz River Valleys for hundreds of years.  In 1964, the Pascua Yaquis received 202 acres of land southwest of Tucson, which forms their present-day reservation.  The Pascua Yaqui Tribe of Arizona was federally recognized in 1978.

22.     The Tribe's ancestral homelands encompass the Santa Rita Mountains, which are known as the Blue Flower Mountains in the Yaqui language.  The Yacqui's ancestors have long used and inhabited these mountains, which provide a source of food,

---

[1] *Ours is the Land* is available at https://vimeo.com/223976575.  This short film was produced by the Nation and depicts in powerful detail the Nation's spiritual, cultural and physical connection to the Santa Rita Mountains.

water, medicinal herbs, traditional materials, and shelter.  Members of the Yaqui Tribe believe these mountains link their ancestors, who are buried there, to current and future generations.

23.     The proposed Rosemont Mine would significantly impact, destroy, or alter cultural and archaeological sites containing numerous burial sites, funerary objects, sacred objects, and other archaeological and cultural items of the Yaqui people, as well as permanently altering the cultural and natural landscape of the area.

24.     The Yaqui Tribe has consistently opposed the proposed mine, submitting formal comments and objections to the Forest Service during the NEPA process for the mine, and has, therefore, exhausted its administrative remedies.

25.     Members of the Yaqui Tribe intend to visit the Santa Rita Mountains, including the area around the proposed Rosemont mine site, in the near future to gather materials used in traditional ceremonies, such as the Deer Dance, and document the presence of medicinal plants and traditional materials in this area.

26.     The HOPI TRIBE is a federally recognized Indian tribe located in northeastern Arizona with approximately 14,475 members.  The Hopi reservation occupies part of Coconino and Navajo counties, encompasses more than 1.5 million acres, and is made up of twelve villages situated on three mesas.

27.     The Hopi Tribe considers the Coronado National Forest, including the site of the proposed Rosemont Mine, part of their ancestral homelands.  Hopi migration traditions and traditional knowledge reveal significant long term cultural ties to the area. The archaeological record also reveals ties between Hopi ancestors and material remains

found in the area, including archaeological sites, human burials, shrines, springs, plants, and animals. These resources have spiritual meaning and represent an ongoing connection to the present-day Hopi people.

28.     The Hopi Tribe has consistently opposed the Rosemont Mine, which would severely impact cultural resources significant to the tribe and the natural environment. The tribe submitted formal comments and objections to the Forest Service during the NEPA process for the mine, and has, therefore, exhausted its administrative remedies. The tribe has repeatedly reiterated its support for the Tohono O'odham Nation's resolution opposing the Rosemont project and the nomination of the entire portion of the Santa Rita Mountains administered by the Forest Service as a Traditional Cultural Property.

29.     Members of the Hopi Tribe have visited, and intend to visit, the Santa Rita Mountains, including the area around the proposed Rosemont mine site, in the near future to offer prayers to their ancestors, connect with their cultural history, and appreciate the beauty of the Santa Rita Mountains.

**DEFENDANTS**

30.     Defendant UNITED STATES FOREST SERVICE is an agency of the United States Department of Agriculture. The Forest Service and its officers are responsible for implementing all laws and regulations relating to the management of the National Forests, including the Coronado National Forest ("CNF").

31.     Defendant SONNY PERDUE is sued in his official capacity as the U.S. Secretary of Agriculture. In that capacity, he is responsible for ensuring that the

Department of Agriculture and its constituent agencies, including the U.S. Forest Service, comply with federal law.

32.    Defendant VICKI CHRISTIANSEN is sued in her official capacity as Interim Chief of the U.S. Forest Service.  In that capacity, she is responsible for ensuring that the U.S. Forest Service complies with federal law.

33.    Defendant KERWIN DEWBERRY is the Forest Supervisor for the CNF.  In that capacity, he is responsible for all decisions affecting the CNF.  Dewberry signed the Record of Decision approving Rosemont's mine plan of operations and the CNF Forest Plan revision.

34.    The above-named defendants have the authority, ability, and obligation to remedy the harms to plaintiffs' interests alleged herein.

## BACKGROUND

### The Historical, Cultural and Religious Significance of the Santa Rita Mountains to the Tribes' Members

35.    For the O'odham, the Santa Rita Mountains, or *Ce:wi Duag* ("Long Mountain" in the O'odham language), is a landscape imbued with cultural significance— a location of sacred sites, ancestral villages and burial sites, and a source of plant, animal, and mineral resources critical to maintaining traditional O'odham culture.  The following picture captures the majesty of this landscape.

11



36.     Tribal elder Joseph Joaquin articulated the Nation's connection to *Ce:wi Duag* as follows:

> T]he land has always been us, and we have always been a part of this land.  We are a part of this land.  And that goes way back in our creation story of how we got here and how these lands are supposed to be taken care of; how this stewardship was awarded to the people living in these lands, to manage these lands the way they see fit.

37.     *Ce:wi Duag* lies within the ancestral lands of the O'odham.  The members of the O'odham once occupied thousands of square miles of desert in what is now central and southern Arizona in the United States and northern Sonora in Mexico, including lands within the proposed mine site, which are traditional areas of O'odham cultural importance.  These lands are higher in elevation than the Nation's reservation lands, are cooler, provide reliable water supplies, abundant wildlife, medicinal plants, and grasses that the Nation's members craft into beautiful and valuable baskets that provide much-

needed income to many of the Nation's members.  These grasses do not grow in the hotter, drier environment of the reservation, and the proposed mine site is the closest location to the reservation where they can be found.

38.     To survive in the extreme conditions of their native environment, the O'odham moved seasonally throughout the territory—including to and within the Santa Rita Mountains—to hunt, gather foods, harvest both medicinal plants and basket-weaving material, and to find reliable sources of water.  This nomadic strategy typified the Nation's successful survival strategy for thousands of years.

39.     Archaeological investigations have documented occupation of the area by Native Americans beginning 10,000 years ago, with sites dating to the following archaeological periods: Archaic, Formative (including Hohokam), and Protohistoric, the latter with Sobaipuri O'odham and probable Apache occupations.  Archaeological excavations conducted in connection with an earlier proposal to develop the ANAMAX copper mine revealed intensive occupation of the area from about A.D. 850 to 1050, including a rare ball court, which was created by the O'odham and Hopi ancestors, the Hohokam.  Archaeologists working on the ANAMAX project unearthed 193 Native American burial sites and countless artifacts from the lands now included in the proposed Rosemont mine site.  These artifacts were removed from the site and stored at the Arizona State Museum, where they remain to this day while the Tohono O'odham attempt to repatriate them to the reservation.

40.     Yaquis have consistently used the Santa Rita Mountains, as documented in ethnohistoric accounts.  Yaqui visits to the Santa Cruz River valley, just west of the Santa

13

Rita Mountains, have been documented in written historical accounts, and numerous Yaquis emigrated from Sonora to southern Arizona in the nineteenth and early twentieth centuries to escape persecution in Mexico. For two centuries, Yaqui medicine men have retreated to areas within the Santa Rita Mountains to prepare for their ceremonies.

41.     The Hopi Tribe claims the Santa Rita Mountains as part of their ancestral homelands. Hopi ancestors resided in the Santa Rita Mountains during their migrations throughout southern Arizona. The Hopi consider the prehistoric archaeological sites in and around the proposed mine as their ancestors' "footprints," which have spiritual meaning and create a continuing connection to these lands.

42.     The ANAMAX excavations—including the disturbance of ancient burial grounds, and the removal of the remains and artifacts—caused tremendous damage to the cultural and religious tradition and beliefs of the Tribes, impacts that would be exacerbated by the Rosemont Mine. The Tribes believe that their ancestors' spirits continue to live in the Santa Rita Mountains and that their burial sites are sacred places. Tribal customs and rules forbid the disturbance of ancestral burial sites; to do otherwise would result in serious, adverse consequences.

43.     The mine site is also home to the endangered jaguar, an animal that members of the Tribes believe is sacred and imbued with spiritual significance. The jaguar is known to the O'odham as *ooshad*, "the spotted one," and regarded by the O'odham as part of the spirit world that appears to give them both strength and access to the world's animating spirit. The jaguar is an important component of the natural environment in which human and environmental elements are linked in a web that may

14

not be disturbed without risking adverse consequences.  Likewise, the Yaqui have long honored the jaguar, as documented by traditional Yaqui warrior shields that contain images of this sacred animal.  The Hopi Tribe also consider the jaguar sacred, as revealed by the traditional regalia with jaguar imagery worn during their ceremonies.

44.     Water is a critical resource in the Santa Rita Mountains in and near the mine site, and its presence brings special spiritual and ecological importance to the land. Creeks emanating from the Santa Rita Mountains, including Empire Gulch, Davidson Canyon, and Cienega Creek, contain perennial or intermittent flowing water fed by springs, seeps, snowmelt, and torrential summer monsoons.  These waterways are crucial to human and wildlife survival in the arid desert conditions of the Santa Rita Mountains.

45.     As acknowledged in the FEIS, "the persistence of these stream systems suggests there is some hydraulic connection to a larger regional source of water."  This is particularly true for Upper Empire Gulch Springs.  "The presence of the Upper Empire Gulch Springs, in an area where most drainages at similar elevations are ephemeral without spring flow, suggests that there is indeed a unique connection to the regional aquifer at this location . . . ."  Furthermore, "isotopic signatures suggest—like many other water sources in this area—that a mix of both regional and local water sources supports Upper Empire Gulch Springs."  The Forest Service's analysis shows that "as a result of mine drawdown … upper Empire Gulch (EG1) would be the most impacted, potentially losing all or most of its pools and riparian vegetation."

46.     The Forest Service determined that the mountain peaks, springs, and drainages of the Santa Rita Mountains are eligible for protection as Traditional Cultural

15

Property ("TCP").  TCPs are a unique category of historic properties that: (1) are rooted a community's history; and (2) are important in maintaining the continuing cultural identity of the community.  TCPs must be evaluated under the NHPA in the same manner as properties included in or eligible for inclusion in the National Register of Historic Places.

47.     The *Ce:wi Duag* TCP totals 143,645 acres, of which almost 90 percent is federal land managed by the U.S. Forest Service and Bureau of Land Management, 7 percent is privately owned, and about 3 percent is state land managed by the Arizona State Land Department.  All the Tribes claim the Santa Rita Mountains as a TCP.

48.     The proposed mine would severely, irreversibly, and irretrievably destroy this cultural landscape and the associated archaeological sites.  Archaeological sites and cultural landscape cannot be reconstructed once they have been destroyed or altered.

## LEGAL BACKGROUND

## I.     The Forest Service's Authority to Regulate Mining Operations

49.     The Forest Service has broad discretion to regulate the occupancy and use of National Forest System lands, including setting aside some public lands for conservation purposes.  The Organic Act confers upon the Forest Service the duty to protect the forests from injury and trespass, and the authority to "regulate their occupancy and use and to preserve the forests thereon from destruction."  16 U.S.C. § 551; *see also* 16 U.S.C. § 528 (stating Congress's policy that "the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes.").  The Forest Service's regulations implementing the Organic Act prohibit unauthorized uses of National Forest System Lands, especially where those activities

16

damage Forest Service resources.  *See* 36 C.F.R. § 261.10 (prohibiting, among other things, significant surface disturbance of Forest Service lands without a special use permit); *id.* § 261.9 (prohibiting, among other things, damage to any natural feature or removing any prehistoric, historic, or archaeological resource from Forest Service lands without an approved operating plan).

50.     The Forest Service may grant members of the public special use permits for the occupancy and use of National Forest System lands, subject to the requirements set forth at 36 C.F.R. §§ 251.54–251.64.  The applicant must file a special use proposal with the District Ranger or Forest Supervisor having jurisdiction over the affected land.  *Id.* § 251.54(b).  The Forest Service conducts an initial screening to determine whether the proposed use meets the "minimum requirements applicable to all special use uses."  *Id.* § 251.54(e)(1).  If the proposal passes this initial screening, the Forest Service conducts a second-level screening which requires, among other things, a showing that proposals are in the public interest.  *Id.* § 251.54(e)(5)(i)-(v).

51.     If the proposed use satisfies the Forest Service's screening criteria, the Forest Service may grant a special use permit, but must include terms and conditions to "[m]inimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment," among other requirements.  *Id.* § 251.56(a)(1)(i)(B).  The Forest Service has broad authority to include additional terms and conditions in the permit to "(A) Protect Federal property and economic interests; (B) Manage efficiently the lands subject to the use and adjacent thereto; (C) Protect other lawful users of the lands adjacent to or occupied by such use; (D) Protect lives and property; (E) Protect the

17

interests of individuals living in the general area of the use who rely on the fish, wildlife, and other biotic resources of the area for subsistence purposes; (F) Require siting to cause the least damage to the environment, taking into consideration feasibility and other relevant factors; and (G) Otherwise protect the public interest." *Id.* § 251.56(a)(1)(ii).

52.   The Forest Service's Part 228 regulations apply to those lands where the Forest Service determines that the applicant has a right under the Mining Law to use National Forest System lands. *Id.* § 228.1. The Part 228 regulations "set forth rules and procedures through which use of the surface of National Forest System lands in connection with operations authorized by the United States mining laws (30 U.S.C. 21–54), which confer a statutory right to enter upon the public lands to search for minerals, shall be conducted so as to minimize adverse environmental impacts on National Forest System surface resources." *Id.* § 228.1.

53.   The Mining Law confers a conditional statutory right to permanently occupy and use public lands that contain valuable mineral deposits. It states:

> Except as otherwise provided, all *valuable mineral deposits* in lands belonging to the United States, both surveyed and unsurveyed, shall be free and open to exploration and purchase, and *the lands in which they are found to occupation and purchase* . . . under regulations prescribed by law, and according to the local customs or rules of miners in the several mining districts, so far as the same are applicable and not inconsistent with the laws of the United States.

30 U.S.C. § 22 (1872) (emphasis added).

54.   Congress only provided a right to the "occupation and purchase" of public lands in which "valuable mineral deposits" are "found." *Id*. Absent the discovery of a valuable mineral deposit, a mining claimant establishes no rights to permanently use and

occupy the surface of the claim, even if the claimant otherwise complies with the posting, recordation, and other applicable statutory and regulatory requirements for claim location and maintenance.  *Id.*

55.     To satisfy the discovery requirement for a valid claim, the mere physical presence of a mineral is insufficient.  The discovered deposit must be of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine.  If the discovered deposit fails the "prudent person" test, the Government has the right to clear the title and to unencumbered possession of the land.

56.     Because rights to permanent occupancy under the Mining Law depend on the presence of valuable mineral deposits, unpatented mining claims containing no valuable mineral deposits confer no rights on the claimant to permanently occupy and use public lands.  Without a valid discovery, a mining claimant's rights to permanently occupy and use public lands are no greater than those of any other member of the general public.

57.     Beyond initial exploration activities, the Forest Service has full authority to regulate, or even deny, mining activities on National Forest System lands that do not contain a valuable mineral deposit.  The Forest Service may, as a matter of discretion and where appropriate, approve occupation of such lands for mining-related activities only if consistent with the Organic Act, the Multiple–Use Sustained–Yield Act, 16 U.S.C. §§ 528–31, the National Forest Management Act, 16 U.S.C. §§ 1600–14, the Forest

Service's implementing regulations, the governing Land and Resource Management Plan, and any other applicable laws.

58.     If the claimant satisfies the discovery requirement, the Mining Law gives claimants the rights to use the surface within the limits of the specific location.  30 U.S.C. § 26 (limiting "the exclusive right of possession and enjoyment of all the surface included *within the lines of their locations*, and of all veins, lodes, and ledges throughout their entire depth . . . ." (emphasis added)).  Further, while the claimant acquires a right to occupy and use the surface of a claim that contains the requisite discovery of a valuable mineral deposit, that right is limited to "prospecting, mining or processing operations and uses reasonably incident thereto."  *Id.*  § 612(b).

59.     The Forest Service retains the authority to regulate disturbance of surface resources on valid mining claims pursuant to its Part 228 Regulations.  *See* 36 C.F.R. Part 228, Subpart A.  The Forest Service also retains the authority to permit uses of the surface area of the claim for purposes other than mining the underlying mineral deposits.  *See* 30 U.S.C. § 612(b).

60.     Congress provided a separate process for mining claimants to locate mill site claims on federal lands outside their valid mining claims for use in supporting development of mineral deposits on their mining claims.  *See* 30 U.S.C. § 42.  The Mining Law provides that "such" nonmineral land may be "embraced and included in" the application for the vein or lode claim with which it is associated.  *Id.* § 42(a).  Hudbay, which acquired control of the Rosemont project, has not located any mill site

20

claims on federal lands to support the rock waste piles or tailings facilities proposed for the development of its nearby patented claims.

## II.   The National Environmental Policy Act

61.   Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment."  42 U.S.C. § 4321.  NEPA implements the precautionary principle to "think first, then act," and requires agencies, "to the fullest extent possible … use all practical means, consistent with the requirements of [NEPA] and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions on the quality of the human environment."  40 C.F.R. § 1500.2(d).

62.   NEPA recognizes the fundamental importance of public involvement in decisions that affect the quality of the environment.  *Id.* § 1500.1(b) (requiring that agencies make "high quality" environmental information available to public officials and citizens "before decisions are made and before actions are taken."); *id.* § 1502.1 (EIS must provide decisionmakers and public a "full and fair discussion" of impacts and of reasonable alternatives to avoid or minimize impacts).   NEPA regulations specifically require consultation with Native American tribes, who have a unique government-to-government relationship with federal agencies.  *Id.* § 1501.2(d)(2).

63.   To fulfill Congress's twin aims of comprehensive environmental analysis and broad, informed public involvement, NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.  NEPA requires

that an EIS: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," 40 C.F.R. § 1502.14(f), and (2) "include discussions of: . . . [m]eans to mitigate adverse environmental impacts (if not already covered under 1502.14(f))." *Id.* § 1502.16(h).

64.    An EIS must take a "hard look" at the environmental impacts of a proposed project and "provide [a] full and fair discussion of significant impacts" associated with a federal decision. *Id.* § 1502.1. "Agencies shall make sure the proposal which is the subject of an [EIS] is properly defined." *Id.* § 1502.4(a).

65.    The rigorous, objective evaluation of a range of reasonable alternatives to the proposed action "is the heart of the NEPA process." 42 U.S.C. § 4332(C)(iii) & (E); 40 C.F.R. § 1502.14. This discussion is intended to provide "a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. The starting point for the alternatives analysis is the statement of purpose and need to which the agency is responding in proposing both the action and the reasonable alternatives to the action. *Id.* § 1502.13. Federal agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives," including "reasonable alternatives not within the jurisdiction of the lead agency." *Id.*; *see also id.* § 1502.14(c).

66.    The consideration of alternatives furthers NEPA's goal by guaranteeing that agency decisionmakers have before them and take into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance.

22

67.     To ensure that implementation of the major federal action complies with legal requirements, NEPA requires an EIS to "state how alternatives considered in it ... will or will not achieve the requirements of ... other environmental laws and policies." *Id.* § 1502.2.  An agency thus has an obligation to accurately identify the legal context and requirements relevant to the proposed decision.

68.     The EIS must include a discussion of the direct, indirect, and cumulative impacts for each reasonable alternative, so that the agency can take a hard look at these impacts before reaching a decision.  *Id.* § 1502.15.  The agency should identify "any adverse environmental effects which cannot be avoided should the proposal be implemented."  42 U.S.C. § 4332(C)(ii).

## III.    The National Historic Preservation Act

69.     Congress enacted the NHPA in 1966 to implement a broad national policy encouraging the preservation of the country's historic and cultural resources.  54 U.S.C. § 300101.  The Advisory Council on Historic Preservation ("ACHP") has promulgated regulations implementing Section 106 that are binding on all other federal agencies.  36 C.F.R. Part 800.

70.     The heart of the NHPA is Section 106, which prohibits federal agencies from approving any federal "undertaking," including the issuance of any license, permit, or approval, without first considering the effects of the action on historic properties or cultural artifacts that are eligible for inclusion in the National Register of Historic Places. 54 U.S.C. §§ 306108, 306114; 36 C.F.R. § 800.16(y).

71.     The NHPA requires agencies to "identify historic properties potentially affected by the undertaking, assess [the project's] effects and seek ways to avoid, minimize or mitigate any adverse effects."  36 C.F.R. § 800.1.

72.     The NHPA regulations recognize the special obligations and relationships between federal agencies and Native American tribes.  Among other things, the agency must provide the tribe with a "reasonable opportunity to identify its concerns about historic properties, including those of religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects."  *Id.* § 800.2(c)(2)(ii)(A).  Further, consultation "should be conducted in a sensitive manner respectful of tribal sovereignty," and "must recognize the government-to-government relationship between the Federal Government and Indian Tribes."  *Id*. § 800.2((c)(2)(ii)(B), (C).  Agencies must also consult with tribes "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize or mitigate adverse effects on historic properties."  *Id.* § 800.6(a); (b)(1)(i).

73.     More broadly, agencies must involve the State Historic Preservation Officer ("SHPO") and the public in each stage of a Section 106 consultation.  *Id.* §§ 800.2, 800.3(f)(2), 800.4(b)(c), 800.14(B)(2)(i).

74.     An agency may undertake its NHPA responsibilities at the same time, and in conjunction with, its NEPA responsibilities.  *Id.* § 800.8.  If the agency determines in the course of preparing an EIS that the proposed action will adversely affect an historic property, it must "develop measures in the . . . EIS to avoid, minimize, or mitigate such effects."  *Id.* § 800.8(c)(4).  The agency's NHPA determinations must be "supported by

sufficient documentation to enable any reviewing parties to understand its basis." *Id*. §
800.11(a).

75.    Prior to engaging in any undertaking, at a minimum, an agency must: (1)
identify the area of potential effects; (2) review existing information on historic
properties within this area (including possible historic properties not yet identified); (3)
seek information about historic properties from relevant parties; (4) evaluate the
undertaking's potential direct, indirect and cumulative effects on historic properties; and
(5) develop and evaluate alternatives or modifications to the undertaking that could
avoid, minimize, or mitigate adverse effects. *Id.* §§ 800.3-800.7.  If the agency finds that
the undertaking will have an adverse effect on historic properties, it must notify the
Advisory Council on Historic Preservation ("ACHP") and resolve those effects as
required by 36 C.F.R. § 800.6.

76.    Under the NHPA, federal agencies may negotiate a programmatic
agreement to govern consultation on a particular program.  *Id.* § 800.14(b), *see also id*. §
800.3(a)(2).  Any such agreement must be consistent with the NHPA and its
implementing regulations.  *Id.* § 800.14(a).  The Forest Service has entered into a
programmatic agreement governing its activities in Arizona, which provides, among other
things, that the Forest Service "shall seek and consider the views of the public in a
manner that reflects the nature and complexity of each undertaking and its potential
effects on history properties . . . ."  The Programmatic Agreement also requires the Forest
Service to consult with Native American tribes regarding the "assessment of effects, and
the resolution of adverse effects" for any property identified by a tribe has having

traditional cultural or religious significance.  First Amended Programmatic Agreement Regarding Historic Property Protection and Responsibilities, executed by (among other states) the Arizona SHPO and United States Department of Agriculture Forest Service Region 3 (2003).

77.     Executive Order 13175 reaffirms the Federal government's commitment to tribal sovereignty, self-determination, and self-government.  Its purpose is to ensure that all Executive departments and agencies consult with Indian tribes and respect tribal sovereignty as they develop policy on issues that impact Indian communities.

## VI.     The Administrative Procedure Act

78.     Judicial review of administrative decisions involving the Organic Act, NEPA, and the NHPA is governed by section 706 of the APA.  *See* 5 U.S.C. § 706.  Under section 706, the reviewing court must determine whether the agency decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

79.     Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

80.     An agency decision cannot be sustained where it is based not on the agency's own judgment but on an erroneous view of the law.  If a reviewing court agrees

26

that the agency misinterpreted the law, it will set aside the agency's action and remand

the case—even though the agency (like a new jury after a mistrial) might later, in the

exercise of its lawful discretion, reach the same result for a different reason.

## FACTUAL BACKGROUND

**The Forest Service FEIS and Record of Decision**

81.     The massive scale of the Rosemont mine and its related facilities and

activities would result in permanent damage to a vast, interconnected, ecologically high-

functioning, culturally significant and undisturbed landscape.  Its magnitude triggered

NEPA's requirement to prepare a comprehensive EIS to study the impact of the mine on

the natural and human environment, and to involve the public meaningfully in the study

process.

82.     The Forest Service initiated the EIS on March 13, 2008 with a scoping

period during which the public could provide its initial comment on the mine proposal.

The Forest Service received 11,082 comments, which raised approximately 16,000

discrete issues regarding the proposal.  The Forest Service then released a draft EIS for

further public comment on October 19, 2011, which drew more than 25,000 comments,

including detailed comments from the Nation.

83.     Two years after it released the draft EIS, the Forest Service issued the FEIS

and draft ROD on December 31, 2013, followed by a 45-day period in which the public

could appeal the decision with written "objections," as provided in the Forest Service's

regulations.  By the close of the objection period, the Forest Service had received 114

objection letters, including objections from the Nation and Pascua Yaqui Tribe.

84.     The Regional Forester rejected each of the objections in 2014, and Kerwin S. Dewberry, Forest Supervisor of the CNF, signed the ROD on June 6, 2017.

85.     In the FEIS, the Forest Service defined the purpose and need for the project to mirror Hudbay's mine proposal.  According to the Forest Service, the purpose and need is "to process the proponent's MPO [mine plan of operations].  The proponent is entitled to conduct operations that are reasonably incident to exploration and development of mineral deposits on its mining claims pursuant to applicable U.S. laws and regulations and is asserting its rights under the General Mining Law to develop, mine, and remove the mineral deposit subject to regulatory laws."  ROD at 6; FEIS at ix.

86.     The ROD asserts that the Forest Service "may impose reasonable conditions to protect surface resources, but cannot materially interfere with reasonably necessary activities under the General Mining Law that are otherwise lawful."  ROD at 14.

87.     To address the purpose and need of the proposal as defined by Hudbay and the Forest Service, the FEIS considered six alternatives, including the no action alternative and five alternative configurations of the waste rock, tailings, plant site, and associated facilities.  All but the statutorily-required "no action" alternative were developed to respond to the defined purpose and need for the action—Hudbay's alleged right to develop the Rosemont mine.

88.     Under the No Action Alternative, the Forest Service would not authorize surface disturbance on National Forest System Lands and the proponent would not develop the Rosemont mineral deposit as proposed.  The Forest Service deemed this

alternative as the Environmentally Preferable Alternative as it "best protects, preserves and enhances historic, cultural, and natural resources."  Nonetheless, the Forest Service rejected the No Action alternative outright on the grounds that it lacked the authority to "categorically prohibit mining or deny reasonable and legal mineral operations under mining law."

89.    Because the Forest Service believed that Hudbay had a right to use the surface of its unpatented claims for mine-related operations, the Forest Service only considered in detail those alternatives that locate the tailings, waste rock, and other processing facilities on National Forest System lands.  As a result, the differences between alternatives are narrow and primarily focus only on the placement and design of the tailings and waste rock facilities, the variations of which all result in similar impacts.

90.    The Forest Service rejected reasonable alternatives provided during the public comment period, such as the no-action alternative, reconfiguring the proposed mine to comply with the CNF Forest Plan (which would otherwise bar mine development on the site), and imposing additional mitigation measures to minimize impacts to surface resources.  These alternatives would have, among other things, limited the impacts to the natural beauty and the culturally significant sites by containing the mining-related activity within the patented lands owned by Hudbay.

91.    The ROD does not mention the fact that the Los Angeles District of the U.S. Army Corps of Engineers recommended denial of a Clean Water Act Section 404 Permit for the mine.  On July 25, 2016, the Los Angeles District found that the Rosemont Mine would significantly degrade waters of the United States, and that Hudbay had failed

to adequately mitigate the adverse impacts of the mine on aquatic ecosystems. Furthermore, the District concluded that implementation of the proposed project would be contrary to the public interest.   According to the District, "[a]mong the key public interest concerns are adverse effects to cultural resources and traditional cultural properties important to tribes."

**The Forest Service's Adoption of the Barrel Alternative and its Destructive Impacts on the Area's Unique Natural and Cultural Characteristics.**

92.    The ROD documents the Forest Service's decision to reject the no action alternative and approve the "Barrel Alternative," which would allow Hudbay to excavate the mineral-bearing ore using open-pit mining techniques.  The mine as proposed would consist of an open pit measuring a mile wide by a half-mile deep; an ore processing plant and support facilities; roads; utilities; waste rock and tailings piles containing over a half billion tons of material; and other ancillary facilities, including access and maintenance roads and electrical supply and water supply lines located on National Forest System lands.  The ROD does not authorize exploration activities on public lands.  The following picture depicts the tremendous scale of the proposed mine.



93.     Excavating the pit will take 18 to 24 months before full-scale mining can occur.  The pit alone will disturb about 955 acres, of which 590 acres are private lands and 365 acres are Forest Service lands.  But in total, the Barrel Alternative, with the pit and its associated industrial and other support facilities, would result in 5,431 acres of impacted lands consisting of 1,197 acres of private land, 574 acres of State land, 3,653 acres of Forest Service land, and 3 acres of land managed by the federal Bureau of Land Management.  Transporting the ore is expected to require 56 round trips via truck, seven days a week, 24 hours a day.

94.     Development of the mine would have devastating impacts on the cultural, religious and historical importance of the affected area.  Sacred sites, ancestral burial grounds, seeps and springs, archaeological sites and landscapes imbued with spiritual significance for the Tribes would be buried, removed and desecrated.  Human remains lying in the mine's path would be disturbed and, in some cases, disinterred and removed. The loss would be irreparable and permanent, leaving future generations of the Tribes' members without access to, or direct experience of, cultural resources that are essential to their traditional practices and religious beliefs.

95.     The mine would also impact sites where the Nation has gathered traditional resources, such as basketry materials (bear grass, Devil's claw, and yucca), medicinal plants, and acorns.  The mine will directly impact 4,228 acres of resource collection areas and permanently impact thousands of additional acres through contamination and groundwater drawdown.  Tribal members dependent on these materials would be forced to travel further and farther afield to collect materials central to the O'odham way of life.

96.     Past, present, and reasonably foreseeable projects exacerbate the impacts of the mine on the Tribes' cultural, religious, and spiritual identity.  The Nation's culture has already been severely impacted by past projects, including Border Patrol and migrant activity, Luke Air Force Base, Sierrita Pipeline, and the ANAMAX excavation, to mention a few.  In the ANAMAX excavations alone, 193 Native American burials were discovered in twelve sites.  The FEIS indicates that an additional 31 habitation sites containing burials and associated funerary articles will be disturbed or destroyed. Cumulatively, these projects threaten to destroy the Tribes' culture itself.

97.     The mine would also have devastating impacts on both surface water and groundwater in the region.  A mine of this magnitude requires enormous amounts of water to operate, and Rosemont would rely on groundwater pumping from regional aquifers to supply this need.  The proposed mine anticipates using up to 5,400 acre-feet per year ("AFY") of fresh water over the first 8 years of the active mining phase (approximately 4.8 million gallons per day) and 4,700 AFY for the remaining mining phases (approximately 4.2 million gallons per day).  In all, the mine expects to use 99,600 acre-feet of fresh water.  Groundwater depletion to serve the mine would be great enough to "reduce groundwater availability to private and public wells in the Santa Cruz Valley" south of Tucson.  FEIS at xi.

98.     Hudbay's operations would dewater the regional aquifer in the vicinity of the mine pit so that it can conduct mining operations at or below the water table. Dewatering of the regional aquifer during active mining would reach between 13,000 to 18,500 acre-feet.

99.     Groundwater depletion would not stop at the end of the mine's life; instead it will continue endlessly into the future.  Because the half-mile deep pit will intersect the aquifer during the course of mining, it will ultimately draw groundwater into the pit, creating a toxic lake whose expansion is limited only by the depth of the water table and the rate of evaporation of the surface water.  The pit is expected to draw 170-370 AFY from the aquifer into the pit in perpetuity, wasting a finite, precious resource on which the Tribes and others depend.

100.    This pit lake would not only collect polluted runoff from the mine site, but it would also create a hydraulic sink, indefinitely drawing groundwater into the pit and away from the surface waters, seeps and springs supported by the regional aquifer.  The pit lake's siphoning of water from the regional aquifer will significantly reduce the surface and subsurface flows of existing waterways like Empire Gulch, Davidson Canyon, Cienega Creek, and multiple seeps and springs.  Groundwater modeling indicates that impacts to Empire Gulch could occur within 20 years of mine closure and would eventually desiccate this perennially-flowing stream.  In addition, the mine will impede natural surface flow from stormwater runoff and subsurface groundwater flows to Barrel Canyon, Davidson Canyon, and Cienega Creek.

101.    In addition to depleting groundwater levels, the mine also threatens groundwater quality.  The EIS acknowledges that runoff from the waste rock and tailings piles could potentially contribute to the degradation of groundwater quality.

102.    The mine would impact the quality and quantity of surface flows. Streamflows in Davidson Canyon and Cienega Creek, both of which drain the mine site area, would be altered and ultimately diminished by the massive tailings and waste rock piles.  These piles also contain toxic pollutants and sediments which will be washed into the creeks during and after storms.  Segments of both Davidson Canyon and Cienega Creek are designated as Outstanding Arizona Waters ("OAWs"), meriting the highest level of protection from degradation under state law.  *See* R18-11-107.01 (Under the "Antidegradation" provisions of Arizona water quality standards, discharges are

34

prohibited unless they "will not degrade existing water quality in the downstream OAW.")

**The Forest Service's Fatally Flawed Rationale for its Decision**

103.   The CNF Supervisor asserts that the Mining Law "constrained" his "decision space" with respect to both the patented and unpatented claims so that he can only "impose reasonable conditions to protect surface resources, but cannot materially interfere with reasonably necessary activities under the General Mining Law that are otherwise lawful." ROD at 14. Further, the CNF Supervisor concluded that "Federal law provides the right for a proponent to develop the mineral resources it owns and to use the surface of its unpatented mining claims for mining and processing operations and reasonably incidental uses (see 30 U.S.C. § 612)." *Id.* That position led the CNF Supervisor to limit his evaluation of the mine proposal under the agency's mining regulations, 36 C.F.R. 228.8, and to discount the full range of his authority under the agency's implementing regulations and statutory authorities, including the Organic Act, the National Forest Management Act, and Multiple-Use Sustained-Yield Act.

104.   The Forest Service never examined or determined whether Hudbay discovered a valuable mineral deposit on the unpatented mining claims where it proposes to locate part of the pit and its waste rock and tailings piles. Indeed, there is no evidence in the record that demonstrates the validity of the mining claims on which the Forest Service summarily approved the dumping of tailings and waste rock.

105.   The Forest Service refused to analyze in detail the no-action alternative, concluding erroneously that it lacked the authority to "prohibit mining or deny reasonable

and legal mineral operations under mining law."  The Forest Service also refused to consider an alternative that complied with the current CNF Forest Plan or that included additional mitigation measures to minimize impacts to surface resources, concluding that such alternatives and mitigation measures "would materially interfere with mineral operations, which is beyond my legal authority."

106.   The Forest Service misinformed the public and undermined NEPA public comment process by claiming that its decision was required by the Mining Law, which, as the Forest Service claimed, "grants citizens the right to conduct mining activities on public lands."

**The Forest Service's Fatally Flawed Consultation with the Tribes under the NHPA**

107.   Due to the impact of the proposed mine on cultural and historic properties, the Forest Service initiated consultation with the Tribes as required by Section 106 of the NHPA.

108.   The Forest Service met with the Tribes on multiple occasions, but consistently rejected the Tribes' appeals that the agency reject some or all of the proposed mining activities in fulfillment of the agency's duty to the Tribes and its authority to protect National Forest lands and the cultural importance associated with those lands. Instead, the Forest Service erroneously narrowed the scope of the consultation process based on its conclusion that the Forest Service was obligated to approve the use of National Forest System Lands for mining operations.  Throughout the consultation process, the Forest Service misinformed the Tribes about the supposedly inevitable impacts of the mine on the Tribes' cultural and religious beliefs, rejected reasonable, less-

harmful alternatives, and misinformed the Tribes about the Forest Service's purported

lack of authority to stem the mine's devastating impacts.

109.   Due to the devastating impact that the proposed mine would have on

ancestral burials and other artifacts, and its destruction of lands and waters that are a

central aspect of the Tribes' religious and cultural traditions, the Tribes consistently

expressed their opposition to the proposed mine throughout the consultation process.

110.   Throughout the NEPA and NHPA consultation processes, the Tribes, led by

the Nation, provided perspective and information to the Forest Service about the essential

cultural and religious connection they have with the lands affected by the mine, including

the spiritual significance of the jaguar, the seeps and springs, native vegetation,

archaeological sites and burial grounds.

111.   In disregard of the Tribes' concerns about the impacts of the proposed

mine, the Forest Service signed a Memorandum of Agreement ("MOA") with the Arizona

SHPO and the ACHP in 2013.  The Forest Service also prepared two Historic Properties

Treatment Plans (HPTPs), both in December 2015:  1) The Historic Properties Treatment

Plan for the Proposed Rosemont Copper Project, Pima County, Arizona; and 2) A Historic

Properties Treatment Plan for Rosemont Copper Utilities, Pima County, Arizona.  The

Tribes did not sign the MOA and expressed strong opposition to the HPTPs due to the

unmitigated loss of important cultural, historic, and religious sites and the associated loss

of access to important native traditions.  Nonetheless, the Forest Service terminated

further consultation with the Tribes based on the unsatisfactory MOA.

## FIRST CLAIM FOR RELIEF

(Violation of Organic Act and APA)

112.   The Tribes re-allege and incorporate each of the preceding paragraphs.

113.   The Forest Service's decision was based on a factually-unsupported and legally-flawed conclusion that Hudbay has a statutory right to locate its waste rock piles, tailings facilities, and other mining-related facilities on public lands where it has unpatented claims.  This conclusion led the Forest Service to impermissibly abandon its authority under the Organic Act and Special Use Permit regulations to protect Forest Service lands and reject proposals that conflict with the public interest and/or fail to minimize impacts to the public lands.  The Forest Service's rationale was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

114.   The Mining Law confers a conditional statutory right to permanently occupy and use public lands only on unpatented claims that contain a valuable mineral deposits.  *See* 30 U.S.C. § 22.  Absent the discovery of a valuable mineral deposit, a mining claimant establishes no rights to permanently use and occupy public lands.

115.   There is no evidence of a mineral deposit, let alone a valuable mineral deposit, on the unpatented claims where the Forest Service felt obligated to approve Hudbay's plan to locate its waste rock piles, tailings facilities, and other mining-related operations.  Indeed, the Forest Service refused to conduct any inquiry into whether Hudbay's unpatented claims contain valuable mineral deposits.

116.    The FEIS indicates that there are no valuable minerals underlying the unpatented claims.  (The actual ore body is located under the adjacent, patented, private land).  Moreover, Hudbay proposes to bury those unpatented claims under approximately one billion tons of waste rock, effectively foreclosing the extraction of any minerals from these claims.

117.    The Forest Service's flawed conclusion that Hudbay was entitled under the Mining Law to permanently occupy the unpatented claims led it to apply the wrong legal standard to its review of the mine proposal.  Instead of invoking its broad authority under the Organic Act and regulations governing the review of Special Use Permits, the Forest Service impermissibly limited the scope of its authority and instead applied narrower regulations (the Part 228 Regulations) intended to protect and encourage mining activities authorized under the Mining Law.   As a result, the Forest Service failed to fulfill its statutory and regulatory duties.

118.    The Forest Service's approval of the Rosemont Mine violated the Organic Act, its implementing regulations, and was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law in violation of the APA.  5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

(NEPA and APA Violations: Failure to Analyze a Reasonable Range
of Alternatives, including the No-Action Alternative)

119.    The Tribes re-allege and incorporate each of the preceding paragraphs.

120.    NEPA requires that agencies "study, develop, and describe appropriate alternatives" to the proposed course of action.  42 U.S.C. §§ 4332(2)(C), (E); 40 C.F.R. §

1502.14.  Federal agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives," including the "no-action" alternative before approving a project with significant environmental effects.  *Id.*

121.   The Forest Service failed to adequately and meaningfully consider a reasonable range of alternatives, including whether Forest Service lands at issue should be used for mining-related operations at all.

122.   The Forest Service dismissed the "no-action" alternative (denying approval of Rosemont's mine plan of operations) based on its erroneous conclusion that Hudbay had a statutory right to dump waste rock and tailings, and construct mining-related processing and other facilities on its unpatented mining claims.

123.   The Forest Service failed to analyze additional mitigation measures to protect environmental and cultural resources, incorrectly concluding that its regulatory authority was constrained by the Mining Law and the Forest Service's regulations relating to mining activities authorized by the Mining Law.

124.   The Forest Service's failure to rigorously explore and objectively evaluate these alternatives violates NEPA and is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF

(NEPA and APA Violations: Failure to Determine
Compliance with Other Environmental Laws)

125.   The Tribes re-allege and incorporate each of the preceding paragraphs.

126.   Environmental impact statements must state how alternatives considered and decisions made will or will not achieve the requirements of other environmental laws and policies.  40 C.F.R. § 1502.2(d).

127.   By erroneously assuming Hudbay had a statutory right to permanently occupy and use the public lands overlying its unpatented claims, the Forest Service violated its obligation to determine whether each alternative, including the no-action alternative, would or would not achieve the requirements of other environmental laws, including the Organic Act and implementing regulations.

128.   This failure violates NEPA and is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law in violation of the APA.  5 U.S.C. § 706(2)(A).

**FOURTH CLAIM FOR RELIEF**

(NEPA and APA Violations: Failure to Take a Hard Look)

129.   The Tribes re-allege and incorporate each of the preceding paragraphs.

130.   NEPA requires federal agencies to take a "hard look" at the environmental impacts of a proposed project and "provide [a] full and fair discussion of significant impacts" associated with a federal decision.  40 C.F.R. § 1502.1; 42 U.S.C. § 4332(C)(i)-(ii); 40 C.F.R. §§ 1502.16, 1508.25(c).

131.   The Forest Service failed to take a "hard look" at cultural impacts to the Tribes as a result of destruction of jaguar habitat and harassment of the only known jaguar in the United States.  Although the FEIS acknowledges that the Nation and other tribes provided information on the cultural significance of the jaguar during the tribal

41

consultation process, the Forest Service did not analyze the jaguar as a cultural resource in the FEIS.  The cultural resources section of the FEIS does not even mention the jaguar as a cultural resource, nor does it recognize the significance of the species to the Nation or to other tribes.

132.    The Forest Service failed to take a hard look at the potential for long-term impacts on traditional resource gathering areas.  While the FEIS recognizes that the proposed mining will impact resource-collecting areas, it indicates that impacts will be "temporary."   The FEIS does not, however, examine the potential for long-term impacts on vegetation, including the impacts of contamination and groundwater drawdown, analyze whether there will be long-term impacts on the Nation if the plants do not re-vegetate to their previous levels, or identify other locations where culturally significant plants could be obtained, so that the full impacts of the Project could be analyzed.

133.    These failures violated NEPA and are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law in violation of the APA.  5 U.S.C. § 706(2)(A).

## FIFTH CLAIM FOR RELIEF

(NEPA and APA Violations: Failure to Analyze Cumulative Impacts)

134.    The Tribes re-allege and incorporate each of the preceding paragraphs.

135.    NEPA requires federal agencies to consider the cumulative effects of a proposed action, i.e., the "incremental impact of the action when added to other past, present, and reasonably foreseeable actions."  40 C.F.R. § 1508.7.  When evaluating cumulative impacts, agencies must do more than catalogue relevant "past projects in the

area." Instead, the EIS must include a useful analysis of the cumulative impacts of past, present and future projects.

136.   The Forest Service failed to analyze the cumulative impacts of the destruction of cultural resources on the Tribes.  The Nation provided the Forest Service with information about the impacts caused by past projects, including the ANAMAX excavation, Sierrita Pipeline, Border Patrol and migrant activity, and Luke Air Force Base.  Yet the FEIS glosses over these projects, lumps them all together as generic modern development, and fails to analyze in detail how this destruction, in concert with past destruction such as the destruction caused by the ANAMAX investigations, will impact the Tribes and their cultural interests.

137.   These failures violated NEPA and are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law in violation of the APA.  5 U.S.C. § 706(2)(A).

**SIXTH CLAIM FOR RELIEF**

(NHPA and APA Violations: Inadequate Consultation)

138.   The Tribes re-allege and incorporate each of the preceding paragraphs.

139.   The Forest Service violated the NHPA by unlawfully circumscribing its authority over Rosemont's unpatented claims and erroneously representing to the Tribes that it had no authority to reject the use of those claims for mine-related purposes.  To the contrary, Rosemont has no right to permanently occupy the public lands overlying these claims unless they contain the discovery of a valuable mineral deposit.  The Forest Service's error tainted its Section 106 consultation with the Tribes and illegally hindered

the consultation's ability to, among other things, "develop measures in the . . . EIS to avoid, minimize, or mitigate" the harm that the Rosemont mine would inflict on the Tribes' religious, cultural and other interests.  36 C.F.R. §§ 800.6(c)(4).

140.    Similarly, the Forest Service's failure to recognize and act on the full scope of its regulatory authority over the unpatented claims illegally constrained the Tribes' ability to meaningfully participate in the resolution of adverse effects.  Each of these failures violated the Forest Service's obligation to respect the Tribes' sovereignty, its trust relationship with the Tribes, and the unique government-to-government relationship between the Forest Service and the Tribes.

## PRAYER FOR RELIEF

WHEREFORE plaintiffs request that the Court:

1.    Declare that the Forest Service's Record of Decision and Final Environmental Impact Statement are unlawful;

2.    Set aside and vacate the Record of Decision and Final Environmental Impact Statement;

3.    Issue injunctive relief against Defendants Secretary of the Agriculture, Chief of the U.S. Forest Service, and Forest Supervisor prohibiting them from enforcing their unlawful decisions;

4.    Award Plaintiffs fees and costs pursuant to 28 U.S.C. § 2412; and

5.    Grant such other relief as the Court deems just and proper.


Respectfully submitted this 12th day of April, 2018.

44

*/s/ Heidi McIntosh*
HEIDI J. McINTOSH
Managing Attorney
Earthjustice, Rocky Mountain Office
633 17th Street, Suite 1600
Denver, CO 80202
T: 303-996-9621
F: 303-623-8083
Hmcintosh@earthjustice.org

STUART C. GILLESPIE
Staff Attorney
Earthjustice, Rocky Mountain Office
633 17th Street, Suite 1600
Denver, CO 80202
T: 303.996.9616
F: 303.623.8083
sgillespie@earthjustice.org

*Counsel for the Tohono O'odham Nation,*
*the Pascua Yaqui Tribe, and the Hopi Tribe*

## CERTIFICATE OF SERVICE

I hereby certify that on April 12, 2018, I filed the foregoing document with the

Clerk's Office using the CM/ECF System and will serve parties via U.S. Mail Certified

Return Receipt on the follow parties:

| | |
|---|---|
| Vicki Christiansen<br>Interim Chief of the United States Forest Service<br>United States Department of Agriculture Forest Service<br>1400 Independence Ave., SW<br>Washington, DC  20250-1111 | United States Department of Agriculture Forest Service<br>1400 Independence Ave., SW<br>Washington, D.C. 20250-1111 |
| Jefferson "Jeff" Sessions<br>United States Attorney General<br>United States Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC  20530-0001 | Sonny Perdue<br>United States Secretary of Agriculture<br>United States Department of Agriculture<br>1400 Independence Ave., SW<br>Washington, D.C.  20250 |
| CIVIL PROCESS CLERK<br>United States Attorney<br>Elizabeth A. Strange<br>District of Arizona<br>405 W. Congress Street, Suite 4800<br>Tucson, AZ  85701-5040 | Kerwin S. Dewberry<br>Supervisor of the Coronado National Forest<br>United States Department of Agriculture<br>300 W. Congress St.<br>Tucson, AZ 85701 |

 /s/ Heidi McIntosh
Heidi McIntosh